Hostetter Estate.

Argued March 21, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Frank W. Ittel,* with him *Charles W. Dithrich* and *Reed, Smith, Shaw & McClay,* for appellants.

*Francis P. Anton,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 22, 1957:

On September 28, 1924, D. Herbert Hostetter of "Hostetter's Stomachic Bitters" fame, died in Pittsburgh, leaving a will which created a spendthrift trust of the residue of his estate for the benefit of his widow, children, and grandchildren, the trust to continue until the death of the last survivor of the named beneficiaries living at the time of his death, the principal then to be distributed among the surviving lineal descendants.

Included in the assets of the residuary estate were 894 shares of stock of the Hostetter Company, originally inventoried at $223,500 ($250 per share) and later increased to $321,840 ($360 per share), in the Executors' First and Final Account, to conform to the transfer inheritance tax appraisal made by the Commonwealth of Pennsylvania. Under a decree of distribution entered June 3, 1926, the shares, *inter alia,* were awarded to the Trustees at the increased value.

The stock represented about 8¼% of the principal of the trust estate, whose total value approximated $3,-900,000.

On February 15, 1933, the trustees exchanged the stock for a parcel of improved real estate belonging to the Hostetter Company. The buildings on this land, located at the Point in Pittsburgh, were razed in September, 1936 because of irreparable flood damage, and the carrying value of the property was reduced to $264,690.22. The land was then commercially used as a parking lot until May 1, 1951, when, by reason of its choice location in the "Golden Triangle," it was condemned under the power of eminent domain by the Urban Redevelopment Authority of Pittsburgh for the Point Park Development Project. On June 16, 1954, the Trustees received $125,000 in payment of the condemned property. Prior to the condemnation, the taxes on this property amounted to $35,084.45 which amount was paid for by income derived from other assets of the trust estate.

When the Seventh and Partial Account (filed August 6, 1954) of the Fidelity Trust Company and Helen Hostetter Griffiths, Surviving Trustees, came before the Orphans' Court of Allegheny County for audit, it was the position of the income beneficiaries that the $125,000 received by the trustees for the Point property should be apportioned between income and principal and that they (the life tenants) were entitled to recoupment in the sum of $35,084.45, for taxes paid on that property. In a stipulation entered into by and between the attorneys for the income beneficiaries, the attorneys for the surviving trustees, and the trustee and guardian ad litem, it was agreed that if apportionment was in order, the income beneficiaries would receive $37,366.34, based on the formula of distribution set forth in Section 241 of the Restatement of the

Law of Trusts. It was agreed further that, if allowed, the amount of recoupment would be $35,084.45, the amount expended from income for taxes, as heretofore stated.

The Court below decided against the income beneficiaries who have become the appellants here. The appellee is the trustee and guardian ad litem appointed by the Court below to represent the interests of minors and persons not in esse. In support of their position for apportionment, the appellants rely heavily on the cases in *Nirdlinger's Estate*, 327 Pa. 171, and 331 Pa. 135, but the history of that litigation shows that the trustees were compelled to foreclose certain mortgages owned by the trust estate, buy in the properties, and sell them in order to prevent serious losses to the estate. In the case at bar, however, there was no such salvage operation. Although it is true that during the period of the depression the land in question had become a white elephant to the estate, it later went into a golden metamorphosis when, with the Point-Clearing Project, it acquired the Midas touch of a commercial parking lot. From 1946 until the day of condemnation the land was showing ever-increasing profits.

It cannot be contended that the trustees were in any way neglectful of their trust in the management or retention of this property. In fact, the appellants concede: "The lower court lays great stress on the fact that no exceptions were filed to the acquisition and retention of the property by the Trustees. The obvious answer was that it was recognized that *the Trustees found themselves in a business depression and were doing the best they could under the circumstances . . ."* (Emphasis supplied.)

The appellants call to our attention Section 241 of the Restatement, Trusts, which provides for allocation of proceeds derived from property which the trustee

was "under a duty to sell," but as stated by the lower Court: "There is no allegation in the case at bar that the trustees failed in their duty in not making a sale of the property before it was taken for public use nor is there any evidence in the record that it was a 'frozen asset'. No exceptions or objections were ever filed by any party in interest to the trustees' continuing to hold the property as an asset and investment of the trust."

The *Nirdlinger* cases, supra, are to be distinguished from the instant case as they were distinguished from *Levy's Estate*, 333 Pa. 440, which is authority for our decision in the instant controversy. In the *Levy* case the decedent left real estate which the trustees held for seven years and then sold, for $102,500, a portion thereof which had been appraised at $86,500. During their seven years in possession the trustees had reaped a profit of only $500, but had expended the sum of $14,057.93 for taxes. The life beneficiaries showed resentment and demanded reimbursement in the amount paid for taxes, citing the *Nirdlinger* cases. This Court held that the *Nirdlinger* precedent did not apply because that estate involved "a salvage of collateral held by the estate, in which both life beneficiary and remainderman had an interest, the former because interest had not been paid. *Nothing said in that opinion was meant to cover such a situation as now before us.*" (Emphasis supplied)

We said further: "The precise question of the allocation of carrying charges of unproductive real estate of which a testator died seized has not been heretofore presented to us." and we concluded with the declaration that whether or not there should be an apportionment in such a controversy "should be determined by considering the equities in each case. The determination of the question is one for the exercise

of a sound discretion by the court of first instance and we will review only where there has been a palpable abuse of discretion."

In *Crozer Estate*, 346 Pa. 446, we again made clear that our decisions in the *Nirdlinger* cases were to be limited to the peculiar circumstances there involved: "Our principal objection to the decree of the court below, however, relates to substance and not merely to procedure. Because some of the real estate was obtained through foreclosure, the sale thereof involves a *salvage operation.* Nirdlinger's Estate No. 2, 327 Pa. 171 and Nirdlinger's Estate, 331 Pa. 135, prescribe the precise methods to be adopted for allocation of proceeds and carrying charges. We will not again repeat what has been written in those cases. Where, however, the real estate is 'decedent owned', and unproductive, an entirely different rule prevails. This is prescribed by Levy's Estate, 333 Pa. 440. *In the latter situation, upon proven or agreed facts, an auditing judge has the discretion, considering the equities of the case, to determine in what proportions the life tenants and the remaindermen shall bear the carrying charges."* (Emphasis supplied)

While it is true that in the *Levy* and *Crozer* cases we were speaking of "decedent-owned" land, whereas in the case at bar the land was not, strictly, "decedent-owned," (even though title to it was held by the Hostetter Corporation and the decedent held almost all, if not all, the stock in the corporation) we see no reason to not apply the rule set forth in *Levy.*

We are satisfied from the record that the Court below weighed the equities on a scale of sensitive justice, and that it would have been inequitable to assign to the life tenants a share of the $125,000 involved, especially since they have already received sizeable amounts in income from this handsome trust estate. Moreover,

it is not to be overlooked that the remaindermen have sustained a substantial loss, insofar as this property is concerned, since it diminished from a book value of $321,840 in 1933 to a realized value of only $125,000 in 1954. Of course, a diminution in value of property means a corresponding decrease in income for the beneficiaries as well, but such a loss is only a natural incident in the fluctuating value of property. Thus, it is only fair that both life beneficiaries and remaindermen, who together own the whole ship of the estate, as it proceeds on the journey charted by the testator, must together suffer the decrease in value of the cargo, damaged by the sea water of chance and fortune.

The same equitable principles answer the second question propounded by the life tenants, namely: Should they be reimbursed from the $125,000 the amount of $35,084.45 which was paid for taxes? Although the Court below may have placed too much emphasis on the reasoning that "income has done no more than its duty under the common law" in determining what its duty was under the equitable doctrine enunciated in *Levy's Estate,* supra, we are satisfied that it did include, in arriving at its decision, a study of all the other important considerations which properly enter into the task of balancing the equities. Therefore, we see no reason to disturb its holding especially, as the Court below stated: "The will of the testator provides that the trustees are to collect the income of the trust and '. . . *after paying all taxes* . . .' are to distribute the '. . . net income.' " (Emphasis supplied)

Lastly, the life tenants argue that the "failure to repay to income the carrying charges on the unproductive real estate and their capitalization constitute an illegal accumulation prohibited by the Act of 1853 P. L. 503 (20 P.S. 3251)." We believe it to be a sufficient answer to this argument to point out that the

payment of taxes on this property was not a capitalization thereof.

Decree affirmed; costs to be borne equally by the parties.